WOOD, Circuit Judge,
concurring in the judgment.
Somehow, in the late hours of December 7, 2007, Gregory Smith’s finger was seriously injured as he was being arrested by Chicago Police Officers JaLance Hunt and Jose Cortes. The injury was obvious enough to the officers that they transported Smith to Holy Cross Hospital after booking him. There he was treated for a dislocated finger — an injury that appears clearly on x-rays that were taken at the hospital. Unfortunately, the treatment was not successful. By December 22, two weeks later, the finger was necrotic; after another week had passed and Smith was arrested again, the police returned him to the hospital and the doctors realized that the finger had to be amputated. It was. Smith then sued the officers under 42 U.S.C. § 1983, asserting that they had used excessive force in both arrests. After a trial, a jury ruled in favor of the defendant officers.
Before this court, Smith’s principal argument is that the district court erred in admitting evidence showing that he had used heroin at some point earlier in the day on December 7. My colleagues believe that the district court did not abuse its discretion in permitting this evidence to be admitted for the purpose of showing what damages Smith suffered. With respect, I cannot join them in this assessment. I thus do not find it necessary or appropriate to analyze the admission of the contested evidence under Federal Rules of Evidence 408 or 404(b). Nevertheless, I agree with the majority that the admission of the heroin-use evidence was harmless error, and on that basis alone, I concur in the judgment of affirmance.
The evidence in question came from a pre-trial deposition in which Smith admitted to using heroin five or six hours before his arrest on December 7. He provided no additional details about that event or about his heroin use in general. The district court first ruled that the evidence could come in, then that it had to stay out, and finally that it could be admitted for the limited purpose of proving damages. In so doing, it rejected both Smith’s general relevance objection and his argument that the evidence, if admitted, had to be accompanied by expert testimony. Smith is right on both points. Standing alone, the evidence was meaningless. Even for the issue of damages, it supported nothing but speculation on the jury’s part. With an expert and with the addition of critical facts, these flaws might have been cured, but that never happened.
It is impossible in the abstract to have any idea what effect Smith’s use of heroin earlier in the day might have had. The possibilities range from zero to significant, but we have no way of selecting a point on that spectrum. The effect of heroin on the human body varies according to a number of variables, including (but probably not limited to) (1) the amount taken, (2) the purity of the substance ingested, (3) the method of administration, (4) user tolerance (because addicts typically need a greater dose to achieve the same result), and (5) time since the dose. See generally NYUSteinhardt, Center for Health, Identity, Behavior & Prevention Studies, Department of Applied Psychology, Substances — Heroin, available at http:// steinhardt.nyu.edu/appsych/chibps/heroin (last visited Feb. 4, 2013); The Gateway Foundation for Alcohol & Drug Treatment, *814 The Facts About Heroin, available at http://recovergateway.org/heroin-abuse/ heroin-facts/ (last visited Feb. 4, 2013) (“Because the strength of heroin varies and its impact is more unpredictable when used with alcohol or other drugs, the user never knows what might happen with the next dose.”); BBC Health, Heroin, available at http://www.bbc.co.uk/health/ emotionaLhealth/addictions/heroin. shtml# effects_of_heroin (last visited Feb. 4, 2013) (“The effects vary depending on how the heroin is taken.”). The record reveals nothing about any of these essential facts. If Smith had taken a small dose and his body was inured to heroin from habitual use, the effects might have worn off entirely by the time of his arrest at 11:25 p.m. If the dose had been large, the purity high, and Smith’s user tolerance low, then he might have still been experiencing some effects. The period during which a dosage is effective, however, appears to be closer to three hours, not five or six. Id. When the district court first excluded the heroin use, it recognized that this foundation was needed to make the evidence relevant: “we don’t know how much he took, and no one’s here who’s going to testify ... how quickly the [drugs] assimilate into his body, how quickly would he recall, how quickly would he be clear headed ... how long would the drug, if at all, numb his pain.... [Tjhose are all questions that without an expert on [the defense’s] side to say, it’s speculation.”
In my opinion, therefore, in the absence of expert testimony tending to show that there was any remaining physiological effect from the heroin Smith had ingested earlier in the day, this evidence had no relevance at all, even to the damages question. The only other theory on which my colleagues rely is the notion that Smith, a heroin user, would be more likely to know that the painkiller Dilaudid is an opiate, see http://www.drugs.com/dilaudid.html (last visited Feb. 4, 2013). Nothing in the record tells us that Smith knew this, even if we credit the testimony indicating that he asked for Dilaudid by name. There is no evidence that his heroin supplier was pushing illicit Dilaudid pills, rather than getting heroin the usual way through criminal channels. Many people know the names of common drugs without being aware of the precise composition of those drugs or their generic names. This also rules out any use of the request for Dilau-did to show that Smith was just looking for another fix, rather than seeking something to alleviate the intense pain of a dislocated finger — pain he described as a 10 out of 10. (The practice of measuring pain on a scale of 0 to 10, with 0 being no pain and 10 being the worse imaginable, is widely used by physicians. See WebMD, Living with Chronic Pain, R. Morgan Griffin, Using the Pain Scale: How to Talk About Pain, available at http://www.webmd.com/ pain-management/chronic-pain-ll/pain-scale (last visited Feb. 4, 2013) (commenting that pain scales “have a lot of good research behind them); TIPNA (The International Pudendal Neuropathy Association) website, Jack Harich, The Comparative Pain Scale, available at http://www. tipna.org/info/documents/ComparativePain Scale.htm (last visited Feb. 4, 2013).) Because we do not know how much heroin Smith ingested, and whether the effects had worn off by the time Smith was hospitalized, we can only speculate that he might have been craving another fix less than 12 hours after ingesting the last dose. While some sources indicate that frequent users may crave heroin “fixes” several times a day, BBC Health, Heroin, supra, others explain that heroin users typically begin to experience withdrawal and severe cravings 48 to 72 hours after their last dose, and no one argues that Smith was *815 anywhere close to that point. See NYUS-teinhardt, Substances — Heroin, supra; Gateway Foundation for Alcohol & Drug Treatment, Risks of Using Heroin, available at http://recovergateway.org/heroin-abuse/heroin-risks/ (last visited Feb. 4, 2013). Even the district court acknowledged at one point that without knowing how much heroin Smith ingested or having expert testimony on how heroin would have affected Smith, the jury would have no basis for inferring that the heroin altered Smith’s conduct or ability to perceive pain at the time of the incident. As I have already said, nothing but unfounded speculation existed to answer such important questions as whether the unknown quantity of heroin had worn off, whether Smith was already craving another fix, whether Smith knew that Dilaudid is an opiate, and the degree to which Dilaudid has effects that satisfy a craving for heroin. In short, I cannot accept this alternative theory either.
Like the majority, I conclude that the prosecutor’s improper statement in the closing argument did not prejudice Smith so seriously as to require a new trial. The district court intervened promptly and appropriately, and Smith gives us no reason to think that the jury did not heed those instructions.
Trials are seldom perfect, and this one was no exception. But Federal Rule of Civil Procedure 61 does not demand perfection. To the contrary, it provides that “[ujnless justice requires otherwise, no error in admitting or excluding evidence — or any other error by the court or a party — is ground for granting a new trial.” Justice does not require otherwise here, in my view, despite the fact that I regard the admission of the evidence about Smith’s heroin use earlier in the day of his arrest as an error. For these reasons, I concur in the judgment.